UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                             No. 11-cr-20540

vs.                                         Hon. Gerald E. Rosen

JIGAR PATEL, D-11,

        Defendant.
_____/

OPINION AND ORDER REGARDING DEFENDANT'S
MOTION TO SUPPRESS STATEMENTS

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on March 01, 2013

PRESENT:   Honorable Gerald E. Rosen
                     United States District Chief Judge

I. INTRODUCTION

Defendant Jigar Patel, a licensed physical therapist assistant, is charged, in two counts of a multi-defendant, multi-count indictment, with participating in a health care fraud conspiracy in violation of 18 U.S.C. § 1349 (Count 1), and money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Count 8). This matter is presently before the Court on Defendant Patel's Motion to Suppress statements he made to Special Agents at the time of his arrest in the early morning hours of September 1, 2011. In this Motion, Defendant argues that he did not knowingly waive his *Miranda* rights before answering

1

the Agents' questions on September 1, 2011, and, therefore, the statements he made to the Agents should be suppressed. The Government has filed a brief in opposition to the Motion.

The Court conducted an evidentiary hearing on this matter, at which hearing the Court heard the testimony of Benjamin Unkefer and Justin Bidwell, Special Agents with the United States Department Health and Human Services, Office of the Inspector General, as well as the testimony of Defendant Jigar Patel. The Court also received into evidence a number of exhibits. Then, at the close of the hearing, the Court granted counsel's request for leave to file supplemental briefs.

Having reviewed the hearing transcript, and having given due consideration to the testimony of the witnesses, the exhibits submitted, the oral arguments of counsel, and the parties' briefs, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

Jigar Patel came to the United States in 2007 from his home in India after completing his bachelor's degree in physical therapy at the Shree Bevi College of Physiotherapy in Maglore, India. Patel testified that in India, his primary and secondary education was conducted Gujarati[1] or Hindi; English was only offered as a course subject. [Tr. pp. 58-60.] In college, however, his "technical" courses, such as anatomy,

---

[1] Gujarati is native to the Indian state of Gujarat, where it is the chief language. Patel testified that he was born in Gujarat.

physiology, biochemistry, pharmacology and neurology, were conducted in English. *Id.*, p. 60.

After completing his college education in India, Patel came to the United States with the intention of settling in Alabama where some friends of his were living. *Id.*, p. 63. However, when he arrived in Alabama, he found that his friends had moved to Michigan. *Id.* So, after three or four months on his own in Alabama, Patel moved to Michigan, and in 2008 went to work as a physical therapy assistant with Physicians Choice Home Health Care. *Id.*, pp. 64-65. He testified that all of his clients speak English; none of them speak Hindi. *Id.* at 65. He further testified that often his clients have difficulty understanding him and vice versa, and he frequently has to repeat what he is saying before he and his clients understand each other. *Id.*

At the time of his arrest in this matter, Patel was 28 years old, and was living in a 650-square-foot, one-bedroom apartment in Madison Heights, Michigan with his mother and his wife, who at the time was three months' pregnant with the couple's first child. Patel testified that his mother and his wife slept in the apartment's one bedroom and he slept on the living room floor. *Id.* p. 66.

At approximately 6:00 a.m. on September 1, 2011, Patel was awakened by the door buzzer.[2] When he inquired over the intercom as to who was at the door, Madison

---

[2] Agents Unkefer and Bidwell testified that they first made contact with Defendant Patel at approximately 6:30 a.m. [*See* Unkefer Testimony, Tr. p. 23; Bidwell Testimony, Tr. p. 41.] Patel, however, said it was closer to 5:30 a.m., because "it was still dark outside." [Tr., p. 73.]

Heights Police Officer Ed Malik, who was a member of the healthcare fraud task force, as a ruse to get Patel to open the door to the building, told him there had been an accident with his car which was parked in a carport in front of the apartment complex. Patel, who was in his pajamas, buzzed the door open, and seven members of the task force, armed with firearms and wearing bullet proof vests entered the apartment. [Tr. p. 75.] Immediately upon entering the apartment, in the presence of Patel's wife and mother, health care task force agents informed Patel that he was under arrest for conspiring to commit health care fraud and money laundering.

After the agents conducted a security sweep of the apartment, Patel was separated from his wife and mother -- he was directed to the dining area of the apartment and his wife and mother were kept in the living room. Patel testified that he was shaking and was made very nervous by the presence of all of the officers and remained that way for the next hour or so. [Tr., pp. 75, 77.] He admitted, however, that he was never threatened by anyone, and said that the agents gave him some water a couple of times to help calm him down. *Id.* at 77.

Agents Unkefer and Bidwell testified that after the apartment was secured, Agent Unkefer read Patel his *Miranda* rights from a card that he carried on his person. Both he and Bidwell testified that Unkefer simply read all of the *Miranda* rights one after another, and only asked Patel if he understood his rights once, at the end of the entire reading, and Patel answered affirmatively. [*See* Unkefer Testimony, Tr. pp. 26-28, 34; Bidwell

Testimony, Tr. p. 43.  *See also* Patel Testimony, Tr. pp. 67-68:

> PATEL:  They says -- they just, they just speak one sentence.
>
>> And this is like do you want to talk to us. And if you going to talk to us like we going to -- we going to help you. If you going to talk to us, we're going to help you.
>
> THE COURT:  Did Agent Unkefer take a card out of his pocket and read it to you?
>
> PATEL:  Yeah. He was like standing.  He was like -- card was here [Indicating]. He was just, he speaking something American.  He speak the sentence.  He put the card inside.  He says do you want to talk to us.  And I said yes.

*Id.*

Patel was never given a card or any paper with the *Miranda* rights on it to read himself.  [Tr. p. 35.]

Unkefer then asked Patel whether he was willing to waive his rights and talk to him without a lawyer being present, and Patel again answered, "yes."  [Unkefer Testimony, Tr. p. 25, 28; Bidwell Testimony, Tr. p. 44.]  Although Unkefer admitted that the agents sometimes have written *Miranda* waiver forms with them for defendants to sign, he testified that he did not have a form with him on September 1, 2011, and although he said it was possible that one of the other agents had a form that day, he never asked any of the other agents for a form.  [Tr., pp. 34-35.]  Unkefer said he did not need Patel to sign a written waiver because "[h]e had already agreed to speak with us and I felt that was sufficient."  *Id.* at p. 34.

5

At the hearing conducted on this matter, Patel was examined extensively on his understanding of his *Miranda* rights and what it means to waive those rights:

> Q [by defense counsel]: Do you know what the word "waive" means?
>
> A [by Patel]: Yeah. The waive means something take out. 'Cause when we -- I know that my college degree, when have the evaluations, when we bring it here and what ever the subject we did in here, call it we waive the subject. So I know waive the subject, remove something.
>
> THE COURT: To remove something?
>
> PATEL: To remove.
>
> * * *
>
> THE COURT: Did you understand that he [Agent Unkefer] had told you that you have a right to remain silent?
>
> PATEL: No.
>
> THE COURT: You did not understand that.
>
> PATEL: He, you know, he speak the couple lines and that's all.
>
> I was like just wake up. He just -- bell. And I open the door. I said be careful. He just walk.
>
> It's like, you know, everything in two, three minutes we been seated on dining table.
>
> * * *
>
> THE COURT: . . . [D]o you know what it means, you have the right to remain silent?
>
> PATEL: Yeah, now I know.

THE COURT:  Did you at the time know?

PATEL:        No.  At that time, I didn't know.

THE COURT:   . . . Agent Unkefer said he read to you "anything you say can be used against you in a court of law."

  Do you remember his reading that to you?

PATEL:        No, I don't remember anything.

  At the end, they give me one paper to sign. . . .  They didn't say what this paper is or anything.  I just signed the paper.

\* \* \*

THE COURT:  Do you know what that means "anything you say can be used against you in a court of law"?

  Do you know what that means?

PATEL:        No. . . .

THE COURT:   . . . He said he read the following statement to you as well.  He said:  "You have the right to consult with a lawyer before questioning and to have a lawyer present during questioning."

PATEL:        No, I don't.  I don't hear anything like that.

\* \* \*

THE COURT:  "If you cannot afford a lawyer, one will be appointed to represent you."

PATEL:        I said by myself that day, you know, I said I cannot afford a lawyer.  I said that you know.

THE COURT:  You said that to him?

>    PATEL:  He says like you know, the -- he came to arrest me.  And I said, you know, I cannot afford a lawyer.  I just said that much.
>
>    And I didn't know anything like the court provide the lawyer.  We have to bring the lawyer in court or anything or stuff.
>
>    \* \* \*
>
>    THE COURT:  Were you familiar with the concept that somebody who is under arrest does not have to talk to the police.  Did you know that?
>
>    PATEL:      No.  Any, any police experience or any -- this is first.  This one is first my experience in life.  So I had one time speeding ticket, but that's all, not any other experience.

Tr. pp. 68-72 (some internal punctuation added).

Once Patel agreed to talk to the agents, Patel's wife and mother were then removed from the apartment and directed to remain on the landing in the hallway outside the door to the apartment.  Agents gave the two women one chair and some pillows to sit on in the hallway. [Tr. pp. 46-47.]  Meanwhile, inside the apartment, Agent Unkefer and Agent Kevin Grove conducted an hour-and-a-half interview of Patel concerning the events giving rise to the charges against Patel.  Agent Bidwell was also inside the apartment for some of the time, and he could hear what was taking place in the interview during that time.  Tr. pp. 47-48.  According to Agents Unkefer and Bidwell, Patel understood Unkefer's questions and never asked for an interpreter or an attorney or that the interview be stopped.  *See* Tr. pp. 29-32; 48. Although Agent Unkefer admitted that the agents had tape recording devices for use to record interviews, no recording was

made of Patel's interview because "[i]t's not our policy to record interviews." Tr. pp. 35-36.[3] After the interview was concluded, Patel was body searched, handcuffed, and transported to the U.S. Marshal's office. Tr. pp. 33, 49.

### III. DISCUSSION

It is well-established that a defendant's waiver of constitutional rights must be voluntarily, knowingly and intelligently made. *Miranda v. Arizona*, 384 U.S. 436, 444, 479 (1966). The prosecution bears the burden of proving by a preponderance of the evidence that a defendant knowingly and voluntarily waived his rights. *Colorado v. Connelly, supra*, 479 U.S. at 168. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court conclude that *Miranda* rights were waived. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

A language barrier is a factor to consider when determining the validity of a waiver. *See United States v. Alaouie*, 940 F.2d 663 (Table), 1991 WL 144479 (6th Cir. 1991); *United States v. Heredia-Fernandez*, 756 F.2d 1412, 1415 (9th Cir.), *cert. denied*, 474 U.S. 836 (1985) ("One precondition for a voluntary custodial confession is a voluntary waiver of *Miranda* rights, and language difficulties may impair the ability of a person in custody to waive these rights in a free and aware manner.").

---

[3] The interview was subsequently memorialized in writing a week later, on September 8, 2011 by Special Agent Grove. *See* Redacted Report of Interview, Amended Exhibit B to Defendant's Motion to Suppress, Dkt. # 168.

In *United States v. Short*, 790 F.2d 464 (6th Cir.1986), the Sixth Circuit determined that the defendant, who had been read her *Miranda* rights in English, had not knowingly and voluntarily waived her rights. The defendant's native language was German; her English usage was "broken" and her understanding of English "deficient." Moreover, the defendant had no knowledge of the American criminal justice system and required the assistance of an interpreter. *See also United States v. Garibay*, 143 F.3d 534, 537–540 (9th Cir. 1998), (defendant, who had difficulty understanding English, did not knowingly and intelligently waive his *Miranda* rights where the police recited the *Miranda* warnings only in English).

As in *Short* and *Garibay*, the Court finds that, in this case, the Defendant did not fully understand and appreciate what it meant to waive his *Miranda* rights or that he knowingly and voluntarily gave up those rights. The Court fully credits Defendant's testimony at the suppression hearing. English is not Mr. Patel's first language. When the Court asked him three times what "waive" meant he said it means to remove something, as in waiving a course requirement for a college degree or a physical therapy license. He never indicated that he understood it to mean to "give up" his rights.

Furthermore, Mr. Patel, though educated and capable of understanding science texts written in English, he was schooled in India where, for the most part, he was taught in his native language. He has little knowledge of the American criminal justice system. He testified that his only encounter with the law was one speeding ticket. He said he

10

does not watch a lot of television or go to the movies much so it cannot be assumed that he would understand his *Miranda* rights as it might be with someone who has grown up in the United States.

Moreover, the agents burst into his apartment and wearing bullet-proof vests and carrying weapons at 6:00 in the morning, when he was barely awake. They would not let him change out of his pajamas and put on jeans and a tee shirt before they began questioning him. He testified he was nervous and shaking when the agents entered his apartment; he was very concerned that the agents might injure his pregnant wife. According to his unrebutted testimony, he did not calm down until after he had been talking to Agents Unkefer and Grove for more than an hour -- long after he was read his *Miranda* rights.

Even Agent Unkefer admitted when he was recalled to the stand after listening to Patel's testimony that he would not have considered what Patel testified he understood after being read the *Miranda* warnings to have been a knowing, voluntary waiver.

Viewing the totality of the circumstances, the Court concludes that Jigar Patel did not knowingly and voluntarily waive his *Miranda* rights before answering the Agents questions after he was placed under arrest on September 1, 2011.

## IV.  CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant's Motion to Suppress Statements

[Dkt. # 157] is GRANTED.

                              s/Gerald E. Rosen
                              Chief Judge, United States District Court

Dated:  March 1, 2013

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 1, 2013, by electronic and/or ordinary mail.

                              s/Julie Owens
                              Case Manager